1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JANE ROE, et al.,

                    Plaintiffs,

        v.

SFBSC MANAGEMENT, LLC, et al.,

                    Defendants.

Case Nos. 14-cv-03616-LB
16-cv-03371-LB
17-cv-00138-LB
17-cv-05288-LB
17-cv-06971-LB
19-cv-03960-LB

**FINAL APPROVAL ORDER**

Re: ECF Nos. 269, 270, 274 (No. 14-cv-03616-LB)

## INTRODUCTION

The plaintiffs in two putative class and collective actions — *Roe v. SFBSC Management, LLC*, No. 14-cv-03616-LB (San Francisco Action), and *Roe 1 and 2 v. Déjà Vu Services, Inc.*, No. 19-cv-03960-LB (San Diego Action transferred to this district) — are current and former exotic dancers who sued nightclubs and their management companies, claiming wage-and-hour violations based on the defendants' allegedly misclassifying them as independent contractors and engaging in "unlawful tip sharing."[1] The parties previously reached a settlement in the San Francisco Action that the court approved.[2] The Ninth Circuit reversed that approval and remanded

---

[1] Second Am. Compl. (San Francisco Action), Ex. B to Settlement Agreement – ECF No. 239-1 at 154–201; Second Am. Compl. (San Diego Action), Ex. C to Settlement Agreement – ECF No. 239-1 at 203–42. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Order, San Francisco Action – ECF No. 178.

ORDER – Nos. 14-cv-03616-LB et al.

the case. *Roes 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019). The parties then reached a global settlement in the San Francisco and San Diego cases, and the court consolidated the cases for settlement purposes and approved the settlement preliminarily.[3]

The plaintiffs moved for final approval of the settlement and for attorney's fees, costs, and enhancement payments.[4] The court held a fairness hearing on November 17, 2022. The court grants final approval to the settlement and grants the requested attorney's fees and costs, but grants only $17,000 in enhancement payments rather than the requested $35,000.

## STATEMENT

### 1.  The Lawsuits

The following sections review lawsuits, appeals, mediations, and objections relevant to the settlement.

#### 1.1    Previous Proceedings in the San Francisco Action

On August 8, 2014, the plaintiffs filed a putative class and collective action on behalf of dancers who performed at eleven nightclubs in San Francisco, California, claiming that the nightclubs and their management company (SFBSC Management) violated wage-and-hours laws (the Fair Labor Standards Act (FLSA), the California Labor Code, and other state laws) by misclassifying the dancers as independent contractors (when they in fact were employees) and by "unlawful tip-splitting."[5] After the court denied the defendants' motion to compel arbitration, the defendants appealed to the Ninth Circuit.[6] Then, after three in-person mediations and many telephone conferences with Ninth Circuit mediator Peter Sherwood, the parties executed a

---

[3] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 47–150; Prelim. Approval Order, *id.* – ECF No. 268. The settlement filings apply to both cases. The order cites the documents in the low-numbered San Francisco Action.

[4] Mot., *id.* – ECF No. 269; Mots. for Attorney's Fees, *id.* – ECF Nos. 270, 274.

[5] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 7 (¶ 20); Am. Compl., *id.* – ECF No. 11.

[6] Order, *id.* – ECF No. 53; Notice of Appeal, *id.* – ECF No. 58.

United States District Court
Northern District of California

1    settlement agreement and, as part of that process, dismissed the appeal without prejudice to its

2    reinstatement if the court did not approve the settlement.[7]

3        The court approved the settlement: (1) $5 million that had the following tiers: a first-tier cash

4    pool of $2 million, a second-tier cash pool of up to $1 million, and a dance-fee pool of up to $1

5    million that involved redeeming the fees (the mandatory costs of the performances) by scheduling

6    a performance; and (2) changed business practices that allowed dancers to elect to be employees

7    or independent contractors. The dancers could opt for a cash payment (up to $800 depending on

8    the number of months worked) or the dance-fee payment.[8]

9        Objectors to the settlement appealed the approval to the Ninth Circuit. On December 11, 2019,

10   the Ninth Circuit reversed the approval on two main grounds: (1) the single mailed notice to the

11   class members (without follow-up, either by reminder notices or electronically) was inadequate for

12   former dancers, given the 18.5-percent claims rate for the 4,681 class members (with 560

13   untraceable through skip-tracing); and (2) the order did not apply the appropriate heightened

14   scrutiny to certain settlement terms: (a) an agreement that the defendants would not object to the

15   plaintiffs' request for fees and costs up to twenty-five percent of the settlement fund, which the

16   Ninth Circuit viewed as a potentially collusive "Clear Sailing Agreement;" (b) the second-tier pool

17   and dance-fee pool; and (c) the amount of the incentive awards. *Roes 1–2*, 944 F.3d at 1039,

18   1046–48. The court remanded for further proceedings that could include negotiating a new

19   settlement, moving for re-approval of the settlement with a new notice plan under the applicable

20   heightened standard, reinstating the earlier appeal of the decision denying arbitration, or

21   proceeding to trial. *Id*. at 1060–61.

22   **1.2    Michigan Action**

23       On March 10, 2016, an entertainer in the Eastern District of Michigan filed a similar lawsuit

24   alleging misclassification as an independent contractor. Ultimately, the case there settled in an

25   agreement that covered all nightclubs in the United States associated with Déjà Vu Consulting (a

26

27   ───────────────
     [7] Order, *id.* – ECF No. 178 at 2.

28   [8] *Id.* at 5–8.

United States District Court
Northern District of California

settling party in the earlier San Francisco Action and in this case) except for the "associated" nightclubs in San Francisco (meaning, those involved in the San Francisco Action). On June 19, 2017, the district court approved the settlement: $6.44 million divided into three categories — a $1 million cash pool, a $4.5 million secondary pool (either dance-fee payments or credits for "daily rent" for performers), and $900,000 in fees.[9] *Doe 1–2 v. Déjà Vu Servs., Inc.*, No. 2:16-cv-10877, 2017 WL 2629101, at *1, 4 (E.D. Mich. June 19, 2017). Objectors to the settlement appealed the approval to the Sixth Circuit, which affirmed the final approval on June 3, 2019. *Does 1–2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 891 (6th Cir. 2019).

### 1.3    Other Lawsuits in the Northern District of California

There are four related cases in the Northern District, all involving similar wage-and-hours claims: (1) *Hughes v. S.A.W. Ent., Ltd.*, No. 16-cv-03371-LB (putative class and collective action by plaintiffs Nicole Hughes, Angelynn Hermes, Penny Nunez, and Diana Tejada); (2) *Pera v. S.A.W. Ent., Ltd.*, No. 17-cv-00138-LB (putative class and collective action by plaintiffs Elana Pera and Sarah Murphy); (3) *Mehraban v. Gold Club-S.F., LLC*, No. 17-cv-05288-LB (individual claims by plaintiff Poohrawn Mehraban); and (4) *Gomez-Ortega v. Déjà Vu – San Francisco LLC*, No. 17-cv-06971-LB (putative class action by plaintiff Elaine Gomez-Ortega).

The settlement and objector settlement (both discussed below) will resolve the putative class, collective, and PAGA claims in *Hughes*, *Gomez-Ortega*, and *Pera*.[10]

### 1.4    Previous Proceedings in the San Diego Action

On May 31, 2019, following the California Supreme Court's decision in *Dynamex Operations W. v. Super. Ct.*, Jane Roes 1 through 4 filed a similar class and collective action in San Diego Superior Court against California nightclubs (other than those in San Francisco) alleging wage-and-hour violations predicated on the misclassification of dancers as independent contractors. 4 Cal. 5th 903 (2018) (holding that "employment status" under the California Industrial Welfare

---

[9] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 5–7 (¶¶ 12–19).

[10] Joint Case Mgmt. Statement, *id.* – ECF No. 250 at 4 (stating that the settlement "will resolve the . . . claims in *Hughes* and *Gomez-Ortega*"); Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263 at 3 (describing "a full and final release of all claims Objectors have alleged against Defendants, including in connection with the related lawsuits").

Commission Wage Orders is governed by the "ABC" test, which essentially presumes that workers are employees, not contractors). They also sent a letter to the California Labor and Workforce Development Agency (LWDA) pursuant to the PAGA to reflect their intent to amend the complaint to add a PAGA claim.[11] The defendants moved to compel arbitration in state court. The parties then mediated the case and ultimately agreed to terms in a letter of understanding dated August 1, 2018.[12]

At this point, given the objections and appeals in the Michigan and San Francisco lawsuits, the plaintiffs met with the objectors' counsel and invited them to participate in the mediations to try to resolve all cases. They accepted, and all parties in the San Diego and San Francisco cases and the objectors mediated with Mark Rudy, a respected employment mediator. The parties were not able to resolve their disputes with the objectors but did reach a settlement.[13] That settlement was $1.5 million, which included payments, PAGA penalties, costs, incentive awards, and attorney's fees. All dancers were to be converted to employees.[14]

The state court granted a motion to intervene by eight dancers.[15] Then, after a hearing on November 30, 2018, it denied without prejudice the plaintiffs' motion for preliminary approval of the settlement, saying that it needed more information from the defendants' accountant about the changed business practices in the settlement (including converting dancers from independent contractors to employees) before it could grant preliminary approval. It also denied the motion to compel arbitration.[16] The defendants then submitted their accountant's declaration estimating the value of those changed business practices.[17]

---

[11] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 3 (¶ 7).

[12] *Id.* at 14 (¶ 38).

[13] *Id.* at 14–15 (¶¶ 38–39).

[14] *Id.* at 15–16 (¶¶ 42–45).

[15] Am. Compl. in Intervention, San Diego Action – ECF No. 1-53.

[16] Thompson Decl. in Supp. of Mot. for Prelim. Approval, San Francisco Action – ECF No. 239-1 at 16 (¶ 46); Minute Order, *id.* – ECF No. 1-47.

[17] Shindel Decl. & Exs., Ex. B to Cahill Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 14–148.

1     On November 30, 2018, the plaintiffs filed an amended complaint limiting the named plaintiffs

2    to Jane Roe 1 and Jane Roe 2.[18] The intervenors filed an amended complaint in intervention

3    adding SFBSC as a defendant.[19] SFBSC then removed the case to federal court in the Southern

4    District of California.[20] All defendants moved for reconsideration of the order denying arbitration

5    and moved to compel the intervenors into arbitration.[21] The San Diego district court denied a

6    motion to remand and transferred the San Diego case to the Northern District.[22]

7

8    **2.  The Settlement Process**

9         In addition to the parties' settlement negotiations described above, they resumed their

10    settlement discussions after the Ninth Circuit's decision. They held a third full-day mediation on

11    March 11, 2020, with Tripper Ortman, who specializes in complex class and collective actions and

12    wage-and-hour cases.[23] The mediation included counsel for the objectors to the previous

13    settlements, did not resolve their objections, and resulted in a basic structure for the parties'

14    settlement of the San Francisco and San Diego lawsuits.[24] The defendants closed their operations

15    during the pandemic, making it hard to predict future income, but by June 2021, the parties agreed

16    to settlement terms, and on September 12, 2021, they signed the settlement agreement.[25]

17         The plaintiffs then moved for preliminary approval and for leave to file amended complaints in

18    both lawsuits and to consolidate the lawsuits for settlement purposes only.[26] The settling

19

20    [18] First Am. Compl., San Diego Action – ECF No. 1-42.

21    [19] Am. Compl. in Intervention, *id.* – ECF No. 1-53.

22    [20] Notice of Removal, *id.* – ECF No. 1.

      [21] Mots., *id.* – ECF Nos. 7–8.

23    [22] Order, *id.* – ECF No. 19.

24    [23] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 30 & n.10; Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 19 (¶ 60).

25    [24] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 19 (¶ 61).

26    [25] *Id.* at 19–20 (¶¶ 60–65); Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 47–150.

27    [26] Mot. for Prelim. Approval, *id.* – ECF No. 239; Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 70–73 (¶¶ 3.1–3.5); Proposed Second Am. Compl. (San Francisco Action), Ex. B to Settlement Agreement – ECF No. 239-1 at 154–201.

28

United States District Court
Northern District of California

1  defendants in the San Francisco Action are SFBSC Management, LLC, Chowder House, Inc.,

2  Déjà Vu – San Francisco, LLC, Roaring 20's, LLC, Garden of Eden, LLC, S.A.W. Entertainment

3  Ltd., Déjà Vu Showgirls of San Francisco, LLC, Gold Club - S.F., LLC, Market St. Cinema, LLC,

4  Bijou - Century, LLC, and BT California, LLC.[27] The settling defendants in the San Diego Action

5  are 3610 Barnett Ave., LLC, Cathay Entertainment, Inc., Coldwater, LLC, Déjà Vu Showgirls –

6  Sacramento, LLC, DV of LA, LLC, Ef5 Acquisitions Group, LLC, Grapevine Entertainment, Inc.,

7  Hollywood & Vine Club, LLC, Jolar Cinema Of San Diego, LTD, Nite Life East, LLC, Showgirls

8  Of San Diego Inc., Stockton Enterprises, LLC, San Francisco - Roaring 20's, LLC, San Francisco

9  – Garden Of Eden, LLC, S.A.W. Entertainment, LTD. – Condor Club, S.A.W. Entertainment,

10  LTD., Gold Club – SF, LLC, Déjà Vu Showgirls of San Francisco, LLC, Déjà Vu – San

11  Francisco, LLC, Chowder House, Inc., Bijou – Century, LLC, B.T. California, LLC, Déjà Vu

12  Services, Inc., Harry Mohney, LA Club Management, LLC, Pine Tree Assets, Inc., SFBSC

13  Management, LLC, and Torrance Food & Beverage, LLC.[28]

14       After the plaintiffs moved for preliminary approval, the plaintiffs in the related Northern

15  District cases (who are also class members in the San Francisco and San Diego cases) filed

16  objections.[29] The parties then negotiated with the objectors, and the objectors agreed to withdraw

17  their objections and release their claims against the defendants in exchange for (1) amendments to

18  the settlement agreement, (2) enhancement payments for the objectors totaling $53,000 (with

19  individual payments ranging from $3,500 to $10,000), and (3) $50,000 in attorney's fees for

20  objector counsel. The amendments to the settlement agreement are in the below description of the

21  settlement's terms. In short, they are (1) an extension of the defendant's changed business

22  practices from one to two years, and (2) a reminder notice to be sent to the class.[30]

23

24  [27] Second Am. Compl. (San Francisco Action), Ex. B to Settlement Agreement – ECF No. 239-1 at
    157–59 (¶¶ 9–20); List of Def. Entities, Ex. A to Settlement Agreement – ECF No. 239-1 at 152.

25
26  [28] Second Am. Compl. (San Diego Action), Ex. C to Settlement Agreement – ECF No. 239-1 at 206–
    08 (¶¶ 11–15); List of Def. Entities, Ex. A to Settlement Agreement – ECF No. 239-1 at 152.

27  [29] Obj., San Diego Action – ECF No. 109; Obj., San Francisco Action – ECF No. 244.

28  [30] Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, San Francisco Action – ECF No. 263;
    Amendment to Settlement Agreement, Ex. 1 to Young Decl. in Supp. of Mot. for Prelim. Approval, *id.*

1    All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636.[31] The court held

2    a fairness hearing on November 17, 2022.

3

4    **3.   The Settlement Agreement**

5        All defined terms in this Final Approval Order have the same definitions as in the Settlement

6    Agreement. (The terms are capitalized below, even if that is grammatically awkward.)

7        **3.1    Settlement Class**

8        The Class is "the group of all Entertainers who Performed at one or more of the Clubs at any

9    time during the applicable Class Periods." Excluded are "those individuals who provide or who

10   have provided services as 'headliner' or 'feature' performers unless such individual was otherwise

11   a party to a Dancer Contract with one or more of the Clubs during the Class Periods."[32]

12       An Entertainer "means an individual who dances, Performs, and/or entertains, or who has

13   danced, Performed or entertained, on the premises of an exotic dance nightclub or 'gentlemen's

14   club' or other adult entertainment facility."[33] To Perform means "all acts of entertaining, dancing,

15   and/or engaging in entertainment services, and all activities related thereto, at an exotic dance

16   nightclub or 'gentlemen's club,' or other adult entertainment facility."[34] The Clubs are "the San

17   Francisco Clubs and the Greater California Clubs" identified as such in Exhibit A to the

18   Settlement Agreement.[35] A Dancer Contract is "a contract entered into between an Entertainer and

19

20

21

22
_____

23   – ECF No. 263-1 at 4–10; Withdrawal of Objs., *id.* – ECF No. 265; Liss-Riordan Decl., *id.* – ECF No. 266; Defs.' & Objectors' Update – ECF No. 278 at 1–6; Exemplar Objector Settlement Agreement,

24   Ex. 1 to *id.* – ECF No. 278 at 7–15.

25   [31] Consents, *id.* – ECF Nos. 7, 18; Consents, San Diego Action – ECF Nos. 30–33.

     [32] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, San

26   Francisco Action – ECF No. 239-1 at 52 (¶ 2.9).

27   [33] *Id.* at 57 (¶ 2.36).

     [34] *Id.* at 62 (¶ 2.66).

28   [35] *Id.* at 54 (¶ 2.16), 59 (¶ 2.45), 64 (¶ 2.77); List of Def. Entities, Ex. A to *id.* – ECF No. 239-1 at 152.

United States District Court
Northern District of California

a Club which permitted or permits the Entertainer to Perform and to engage in the sale of personal entertainment Performances or sessions for remuneration upon the Club's premises."[36]

There are two Class Periods, to reflect the different timelines and defendants in the lawsuits. The San Francisco Class Period is "the time period from August 8, 2010 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the San Francisco Clubs." The Greater California Class Period is "the time period from February 8, 2017 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the Greater California Clubs." "An Entertainer may be subject to both Class Periods if she Performed at one or more of the San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Club[s] during the Greater California Class Period."[37]

"Counsel understands that the individuals referenced as 'headliner' or 'feature' performers are well-known dancers who perform at the Clubs for a limited period of time based on an individually negotiated contract. Their performances are generally advertised as a special event, being hosted by the Clubs."[38]

There are 8,402 class members.[39] Eight other individuals contacted the Settlement Administrator claiming to be class members, but the defendants determined that some did not work at the nightclubs during the class periods, and the others "could not be located in any of the nightclubs' records."[40]

---

[36] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 56 (¶ 2.28).

[37] *Id.* at 53–54 (¶ 2.14), 59 (¶ 2.47).

[38] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 20 (¶ 68).

[39] Butler Decl. – ECF No. 269-1 at 3 (¶ 5).

[40] Suppl. Butler Decl. – ECF No. 276 at 3 (¶ 7).

United States District Court
Northern District of California

United States District Court
Northern District of California

1

### 3.2    Settlement Benefits

2      The total Settlement Consideration is at least $6.5 million (all non-reversionary), divided into a

3  Cash Pool of $4 million, a Dance Fee Pool of $500,000, and changed business practices valued at

4  a minimum of $2,000,000.[41]

5      The Cash Pool will be reduced by the following deductions: (1) $125,000 in PAGA Payments

6  (seventy-five percent to the LWDA and twenty-five percent to the Settlement Class Members,

7  calculated on a pro rata basis based on the ratio of a member's Form 1099 Payments during the

8  Class Period to the all Form 1099 Payments received by all members during their applicable Class

9  Periods); (2) $35,000 in Enhancement Payments to the Class Representatives (with a maximum

10  per-member payment of $5,000); (3) Administrative Costs estimated as $150,000 (originally

11  estimated at $90,000 but then increased as a result of changes to the notice program negotiated by

12  the objectors); and (4) any Attorneys' Fees and Expenses Award approved by the court (with

13  expenses not to exceed $80,000 and an attorney's fees award not to exceed thirty-five percent of

14  the Settlement Consideration, but the attorney's fees award will be reduced by $50,000 paid to

15  objector counsel).[42] The plaintiffs originally estimated that the deductions result in a Net Cash

16  Fund for claims of between $1.745 million and $2.245 million.[43] But because the Administrative

17  Costs increased by $60,000 as a result of negotiations with the objectors, the Net Cash Fund will

18  likely be between $1.685 million and $2.185 million.

19

20

21

22

23

---

24  [41] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF
No. 239-1 at 79–80 (¶¶ 5.1–5.2); Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No.
25  263 at 4–5.

26  [42] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 20–21 & n.4; Settlement Agreement, Ex. B to
Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 60 (¶ 2.53), 79–80 (¶¶
27  5.1–5.2), 97 (¶ 10.1); Amendment to Settlement Agreement, Ex. 1 to Young Decl. in Supp. of Mot. for
Prelim. Approval, *id.* – ECF No. 263-1 at 6–7.

28  [43] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 20–21 & n.4.

1    Separately from the Settlement Consideration, the settling objectors seek a total of $53,000,

2    with individual payments ranging from $3,500 to $10,000. These objectors will opt out of the

3    settlement, "thereby increasing funds available for the remainder of the Class."[44]

4    Settlement Class Members can elect to receive Dance Fee Payments, which will come out of

5    the $500,000 Dance Fee Pool.[45] Dance Fees are the mandatory charges that customers pay to

6    purchase performances. Electing a Dance Fee Payment means that the dancer receives 100 percent

7    of the Dance Fee.[46]

8    The Dance Fees will be distributed on the same formula used for the Cash Payments. That

9    means that if the Dance Fee Payments exceed the $500,000, they will be prorated by (1) dividing

10    the Dance Fee Claimant's Form 1099 Payments into the amount of Form 1099 Payments received

11    by all Dance Fee Claimants, and (2) multiplying that number by $500,000. There are other limits

12    to the Dance Fee Payments, such as choosing one Club, submitting request forms at least seven

13    days before the desired performance date, and allowing Clubs to limit performances on any one

14    day to seven dancers, on a first-come/first-served basis. If the Settlement Class Member elects to

15    receive her payment as a Dance Fee Payment but does not obtain her payments within the Dance

16    Fee Payment Collection Period (meaning, within one year of the Effective Date), then the unused

17    amount will be issued to the Dance Fee Claimant as a check.[47] If less than $500,000 is claimed,

18    then this "Unclaimed Dance Fee Pool . . . will be allocated to the Cash Pool," where it will be

19    distributed to the class in cash.[48]

20

21

22    [44] Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263 at 3–4; Amendment to
Settlement Agreement, Ex. 1 to Young Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No.
23    263-1 at 7; Defs.' & Objectors' Update – ECF No. 278 at 4–5; Exemplar Objector Settlement
Agreement, Ex. 1 to *id.* – ECF No. 278 at 11 (¶ 6).

24    [45] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF
No. 239-1 at 55 (¶ 2.27), 87 (¶ 7.1); Dance Fee Payment Election Form, Ex. E to *id.* – ECF No. 239-1
25    at 255–56.

26    [46] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF
No. 239-1 at 54 (¶ 2.19), 55 (¶ 2.22), 88 (¶ 7.3).

27    [47] *Id.* at 55 (¶ 2.23), 70 (¶ 2.93), 80–81 (¶ 5.3), 85 (¶ 6.3.1), 87–90 (¶¶ 7.1–7.9).

28    [48] *Id.* at 70 (¶ 2.91), 80–81 (¶ 5.3), 87 (¶ 7.1), 89 (¶ 7.7).

United States District Court
Northern District of California

1    Settlement Class Members who do not elect to receive Dance Fee Payments will receive a

2    Cash Payment from the Cash Pool (or more accurately from the Net Cash Fund plus the

3    Unclaimed Dance Fee Pool) automatically, meaning, without filing any claim form.[49] The

4    payments are calculated on a pro rata basis by dividing the Settlement Class Member's Form 1099

5    Payments during her Class Period by the total amount of Form 1099 Payments received by all

6    Settlement Class Members during their applicable Class Periods. Settlement Class Members who

7    were not issued Form 1099s will be "assigned a Form 1099 Payment number of $599."[50] The

8    plaintiffs estimate that the average recovery, if measured by the net settlement amount, is $274.35,

9    or five percent of the average individual damages. Considering the gross settlement amount (the

10   Settlement Consideration) of $6.5 million, the plaintiffs calculate that the settlement recovers

11   about fourteen percent of total damages.[51]

12       The agreement gives the defendants time to fund the settlement "due in large part to COVID-

13   19."[52] The defendants will fund the Cash portion in four installments: (1) an initial payment to the

14   Notice and Administrative Fund within five business days of the Preliminary Approval Date; (2)

15   an initial payment of $2 million by March 1, 2022; (3) a second payment of $1 million by March

16   1, 2023; and (4) a final payment of the remainder by March 1, 2024.[53] Payments will be made to

17   claimants in three installments on a pro rata basis (after the payments in the last section) as

18   follows: (1) after approval, and assuming no appeal, but otherwise on the Effective Date (allowing

19   for any appeal), the following will be paid out of the initial installment within thirty days: the

20   initial pro-rata installment payment to the Cash Pool recipients, the LWDA's PAGA payment, the

21   Enhancement Payments, and fifty percent of the Attorneys' Fees and Expenses Award; and (2)

---

[49] *Id.* at 52 (¶ 2.5), 78 (¶ 4.11).

[50] *Id.* at 58–59 (¶ 2.44), 85 (¶ 6.3.1).

[51] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 31–32 (¶ 113) (estimating twelve percent before the objector settlement added $1 million to the Settlement Consideration).

[52] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 21.

[53] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 80–81 (¶ 5.3).

United States District Court
Northern District of California

1    again within thirty days (assuming no appeal) after the second and third payments, the Cash Pool

2    Recipients will receive their second and third installments, and the attorneys will receive their

3    remaining twenty-five-percent installment payments.[54] (An appeal alters those deadlines, a

4    concept captured in the settlement agreement's Effective Date.[55])

5        Settlement Class Members have 180 days to cash the checks. If any checks are uncashed, the

6    Settlement Administrator will try to find a valid mailing address and resend the check. If checks are

7    uncashed after 180 days (after skip tracing), then the Settlement Administer will deliver the funds to

8    the California State Controller's Unclaimed Property Fund, to be held for the Settlement Class

9    Members (but without providing their names so as to preserve their privacy).[56]

10       The settlement has further relief in the form of changed business practices. The Clubs are

11   required to "convert all Entertainers who will be performing in their facilities to employees,"

12   which means they are eligible for Social Security, Medicare, worker's compensation and

13   employment insurance, and protection under federal, state, and local laws applying to employees

14   (as opposed to independent contractors), such as the National Labor Relations Act, Title VII of the

15   Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with

16   Disabilities Act, the Older Worker Benefits Act, the Fair Labor Standards Act, and the Family

17   Medical Leave Act. This conversion was "completed by November 16, 2018." The agreement

18   provides that the Clubs can alter their employment relationship with the Entertainers only if the

19   law in California about the distinction between employees and independent contractors changes to

20   modify or invalidate, in whole or in part, the "ABC" test in *Dynamex*.[57] The employees will also

21   receive further benefits not required to be remitted by law, including commission payments of a

22   minimum of forty percent on their dance sales and a $25 monthly footwear allowance (the

23

24   _____

25   [54] *Id.* at 82–83 (¶ 5.5.2).

     [55] *Id.* at 83–84 (¶ 5.5.3–5.5.5).

26   [56] *Id.* at 86–87 (¶ 6.6).

27   [57] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 22–23; Settlement Agreement, Ex. B to Thompson
     Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 92 (¶ 9.1), 93–94 (¶ 9.4), 96
28   (¶ 9.10).

United States District Court
Northern District of California

Enhanced Terms of Employment), for at least two years following final approval (increased from one to two years as a result of negotiations with the objectors).[58]

The agreement originally valued the benefits to dancers from the changed business practices "at a minimum of $1,000,000," a valuation that was "significantly conservative" because the defendants' accountant estimated the changes to be worth over $16 million per year ($12,474,093 for the Enhanced Terms of Employment and $3,819,807 for the conversion to employee status).[59] The accountant estimated the value of the Enhanced Terms of Employment by first determining a per-shift value and then multiplying that by the estimated number of shifts worked per year by all dancers. He estimated the value of the conversion to employee status by adding "the legally required benefits of employment" to "the 'enhanced' benefits of employment set forth in the settlement." For both calculations, he adjusted for the benefits of the prior Michigan settlement so as to avoid double-counting the settlement benefits.[60] He based his calculations on, among other documents, computer reports from four representative Clubs from 2017 and 2019 showing, "among other things, the number of Entertainers performing, dates of performances, hours performed, gross Dance Fee revenues generated by Entertainers, and net Dance Fees paid by the Clubs to the Entertainers."[61]

Because the negotiations with the objectors increased the length of the Enhanced Terms of Employment from one to two years, "the value of the settlement . . . increased by at least $1,000,000."[62]

---

[58] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 22–23; Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 92 (¶ 9.1); Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 16; Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 25 (¶ 88); Amendment to Settlement Agreement, Ex. 1 to Young Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263-1 at 5–6 (¶ 9.1).

[59] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 80 (¶ 5.2(c)); Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 18–19; Shindel Mem., Ex. 4 to Shindel. Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 135–38.

[60] Shindel Mem., Ex. 4 to Shindel. Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 135.

[61] Shindel Decl. in re Mot. for Prelim. Approval, Ex. B to Cahill Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 20–22 (¶¶ 17–19).

[62] Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263 at 4–5.

United States District Court
Northern District of California

### 3.3    Release

The release is, in short, a release of all claims under federal or state law that were pleaded or could have been pleaded under the facts alleged in the complaints or the Amended Complaints for Settlement, plus any claims "that are reasonably related" to those pleadings, "from the beginning of [Settlement Class Members'] applicable Class Period(s) up to and including November 16, 2018." As to the FLSA claims, only members who consent to join will be bound by the FLSA release. The Settlement Checks will contain opt-in language indicating a Settlement Class Member's consent to join the settlement and to release the FLSA claims.[63]

Separate releases were agreed to by the settling objectors in exchange for resolution of their objections. They have agreed to "a full and final release of all claims [they] have alleged against [the defendants], including in connection with the related lawsuits, *Hughes v. S.A.W. Ent., LTD* (Case No. 3:16-cv-03371-LB) and *Pera et al v. Saw Ent. Ltd.* (Case No. 3:17-cv-00138-LB)."[64]

### 3.4    Administration

Simpluris, Inc. is the Settlement Administrator. "Class Counsel has experience with Simpluris . . . and have found it to be a competent and competitive[ly] priced settlement administrator."[65]

Simpluris mailed and emailed the Class Notice and Dance Fee Payment Election Form and created a website with the Notice and other important information.[66] The Notice "was successfully delivered to 93.17% of the Settlement Class by physical mailing and to 7.49% of the Settlement Class by e-mail." Ultimately, "the Notice was successfully delivered to 94.49% of the Settlement

---

[63] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 61–62 (¶ 2.64), 65–69 (¶ 2.85), 78 (¶ 4.12), 86 (¶ 6.5), 100–105 (¶¶ 12.1–12.13).

[64] Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263 at 3; Defs.' & Objectors' Update – ECF No. 278 at 3–4; Exemplar Objector Settlement Agreement, Ex. 1 to *id.* – ECF No. 278 at 10–11 (¶ 5).

[65] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 28 (¶ 97); Simpluris Estimate, Ex. C to *id.* – ECF No. 239-1 at 266–70.

[66] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 74–79 (¶¶ 4.1–4.10); Notices, Exs. D, G & H to *id.* – ECF No. 239-1 at 244–53, 262, 264; Butler Decl. – ECF No. 269-1; Notices, Exs. A–F to *id.* – ECF No. 269-1 at 7–28.

Class."[67] The initial mailing occurred on August 19, 2022, and after 2,951 Notice Packets were returned undeliverable, Simpluris used "advanced address searches (skip-trace)" to obtain updated addresses and re-send the Notice Packets.[68] "On September 16, 2022, Simpluris sent a Reminder Postcard . . . to 8,150 Class Members Class Members who had not yet submitted either a Dance Fee Election Form or a Request for Exclusion Form." Of those, 266 were returned undeliverable.[69] Simpluris also sent e-mail Notices to 643 Settlement Class Members for whom an e-mail address was available, and fourteen of these e-mails were returned undeliverable.[70]

The Notice was also posted in each Club's dressing room and kept there for ninety days after the filing date for the motion for final approval.[71] The Electronically Posted Notice was posted on the StripperWeb.com "Stripping (was Stripping General)" discussion thread (as suggested by the Ninth Circuit, *Roes 1–2*, 944 F.3d at 1047) for eight weeks, and provided to the International Entertainment Adult Union to post on its internet message board and email to its subscriber list. And the Social Media Notice was published on Facebook ("funded in the total amount of $10,000"). These electronic notices had hyperlinks to the Settlement Website.[72]

As a result of negotiations with the objectors, a reminder notice will be sent "no later than 90 days after the third installment payment."[73]

The deadline for Settlement Class Members to submit a Dance Fee Election Form or request exclusion from or object to the settlement was October 17, 2022. The Settlement Administrator received 187 valid Dance Fee Election Forms (one was submitted late but the parties stipulated

---

[67] Suppl. Butler Decl. – ECF No. 276 at 3 (¶ 6).

[68] *Id.* at 2 (¶ 4).

[69] *Id.* at 3–4 (¶ 8).

[70] *Id.* at 3 (¶ 5).

[71] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 75–76 (¶ 4.6).

[72] Butler Decl. – ECF No. 269-1 at 4–5 (¶¶ 14–15); Electronically Posted Notices & Social Media Notice, Exs. D–F to *id.* – ECF No. 269-1 at 23–28; Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 77 (¶ 4.9).

[73] Amendment to Settlement Agreement, Ex. 1 to Young Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263-1 at 6.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that it be accepted) and twenty requests for exclusion.[74] Besides the settling objectors, two other Settlement Class Members objected to the settlement.[75]

## ANALYSIS

### 1. Jurisdiction

The court has diversity jurisdiction under the Class Action Fairness Act (CAFA). 28 U.S.C. § 1332(d)(2).

### 2. Certification of Settlement Class

The initial inquiry is whether the class meets the requirements for class certification under Rule 23 and for collective actions under the FLSA.

#### 2.1    Rule 23 Requirements

The court reviews the propriety of class certification under Federal Rule of Civil Procedure 23(a) and (b). When parties enter into a settlement before the court certifies a class, the court "must pay 'undiluted, even heightened, attention' to class certification requirements" because the court will not have the opportunity to adjust the class based on information revealed at trial. *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Class certification requires the following: (1) the class is so numerous that joinder of all members individually is "impracticable"; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the person representing the class will fairly and adequately protect the interests of all class members. Fed. R. Civ. P. 23(a); *Staton*, 327 F.3d at 953. Also, the common questions of law or fact must predominate over any questions affecting only individual class members, and the

---

[74] Suppl. Butler Decl. – ECF No. 276 at 4 (¶¶ 12–15).

[75] Obj. – ECF No. 273.

United States District Court
Northern District of California

1    class action must be superior to other available methods for fairly and efficiently adjudicating the

2    controversy. Fed. R. Civ. P. 23(b)(3).

3        The court finds (for settlement purposes only) that the proposed settlement class meets the

4    Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy. Also, under Rule

5    23(b)(3) (and for settlement purposes only), common questions predominate over any questions

6    affecting only individual members, and a class action is superior to other available methods.

7        First, with over 8,000 members, the class is numerous. *Nelson v. Avon Prods.*, No. 14-cv-

8    02276-BLF, 2015 WL 1778326, at *5 (N.D. Cal. Apr. 17, 2015) (holding that a class of 187

9    employees satisfied the numerosity requirement provided by Rule 23(a)(1)).

10       Second, there are questions of law and fact common to the class. All class members worked

11   for one of the defendant nightclubs as dancers. Common questions include whether they were

12   classified properly as independent contractors and whether the defendants' practice of not paying

13   minimum wage and not paying overtime violated federal, state, or local law. Thus, the claims

14   depend on common contentions, the determination of which "will resolve an issue that is central to

15   the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

16   350 (2011); *Betorina v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758, at *4

17   (N.D. Cal. Apr. 6, 2017). Furthermore, these common questions predominate over any questions

18   affecting only individual members.

19       Third, the claims of the representative parties are typical of the claims of the class. All have

20   worked as dancers for the defendants during the class period, and all class members allege wage-

21   and-hour violations based on similar facts. All representatives possess the same interest and suffer

22   from the same injury. *Betorina*, 2017 WL 1278758, at *4.

23       Fourth, the representative parties will fairly and adequately protect the interests of the class.

24   Two factors are relevant to the adequacy determination: (1) whether the named plaintiffs and their

25   counsel have potential conflicts with the other class members; and (2) whether counsel chosen by

26   the representative party is qualified, experienced, and able to vigorously conduct the litigation. *In*

27   *re Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (citing *Hanlon*, 150 F.3d

28   at 1020). Here, the named plaintiffs have shared claims and interests with the class (and no

United States District Court
Northern District of California

conflicts of interest), and they retained qualified and competent counsel who have prosecuted the case vigorously.[76] *See id.*; *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1021–22.

Fifth, a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Brown v. Hain Celestial Grp., Inc.*, No. 11-cv-03082-LB, 2014 WL 6483216, at *15–20 (N.D. Cal. Nov. 18, 2014).

In sum, the prerequisites of Rule 23(a) and (b)(3) are met. The court certifies the class under Rule 23(b)(3) for settlement purposes only.

### 2.2    FLSA Requirements

The FLSA authorizes "opt-in" representative actions where the complaining parties are "similarly situated" to other employees. 29 U.S.C. § 216(b); *see generally Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 448 (2016). Here, all class members have worked as dancers for one or more defendants during the class period, and their wage-and-hours claims — and related issues such as independent-contractor status — present common fact and law questions under federal and California law. The court certifies the FLSA class for settlement purposes only.


### 3.    Approval of Settlement

A court may approve a proposed class-action settlement only "after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether":

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;
> >
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

---

[76] Class Representative Decls., *id.* – ECF Nos. 239-3 to -6; Sommers Schwartz Firm Resume, Ex. A to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 36–45.

United States District Court
Northern District of California

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). These factors "are substantially similar to those articulated" in *Hanlon*, 150 F. 3d at 1027. *Student A v. Berkeley Unified Sch. Dist.*, No. 17-cv-02510-JST, 2021 WL 6332353, at *2 n.2 (N.D. Cal. July 8, 2021).

In *Hanlon*, the Ninth Circuit identified factors relevant to assessing a settlement proposal: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceeding; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of class members to the proposed settlement. 150 F.3d at 1026.

When parties "negotiate a settlement agreement before the class has been certified, settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Roes 1–2*, 944 F.3d at 1048 (cleaned up). "Specifically, such settlement agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Id*. at 1048–49 (cleaned up).

The court has evaluated the settlement agreement for overall fairness and concludes that it is free of collusion and approval is appropriate.

First, the settlement value is fair, reasonable and adequate. It is within the range of possible approval.

The settlement's gross amount of $6.5 million (which is a very conservative estimate of the monetary benefits, particularly those resulting from the changed business practices) recovers about fourteen percent of the claimed best-case damages scenario of $45.8 million.[77] Courts routinely

---

[77] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 8–10 (¶¶ 26–34), 31–32 (¶ 113).

United States District Court
Northern District of California

United States District Court
Northern District of California

assess a class's recovery by comparing the gross rather than net settlement amount to the best-case damages scenario, *see, e.g.*, *Viceral v. Mistras Grp., Inc.*, No. 15-cv-02198-EMC, 2016 WL 5907869, at *2, 7–8 (N.D. Cal. Oct. 11, 2016), and twelve percent of the best-case scenario is within the range courts approve. The plaintiffs identify the following settlements as comparable.[78]

| Case | Recovery |
| --- | --- |
| *Viceral*, 2016 WL 5907869, at *3, *7 | 8.1% |
| *Leverage v. Traeger Pellet Grills, LLC*, No. 16-CV-00784, 2017 WL 2797811, at *7 (N.D. Cal. June 28, 2017) | 18% |
| *In re Newbridge Networks Sec. Litig.*, No. No. CIV. A. 94–1678–LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) | 6–12% |
| *Strube v. Am. Equity Inv. Life Ins. Co.*, 266 F.R.D. 688, 698 (M.D. Fla. 2005) | 2% |
| *In re Toys R Us-Del., Inc.*, 295 F.R.D. 438, 453–54 (C.D. Cal. 2014) | 3% |
| *Reed v. 1-800 Contacts Inc.*, No. 12–cv–02359 JM (BGS), 2014 WL 29011, at *6 (S.D. Cal. Jan. 2, 2014) | 1.7% |
| *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 229 (E.D.N.Y. 2013) | 2.5% |

The plaintiffs also identify settlements in four other "wage-and-hour cases alleging misclassification of exotic dancers," in which the settlement amounts and structures were comparable to those here.[79]

Moreover, the parties' $2 million minimum valuation of the settlement's changed business practices is adequately proven. The changes represent an ascertainable and largely monetary benefit to the Class.[80] Based on the defendants' detailed computer data showing the compensation and shift-length history of individual dancers (as recorded by "the use by the [dancer] herself of an electronic fob tied into the computer program"), the defendants' accountant was able to accurately

---

[78] Mot., *id.* – ECF No. 269 at 21.

[79] *Id.* at 19–20 (collecting cases).

[80] Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 16–19.

1  quantify the value of the changed business practices.[81] And again, the $2 million valuation is a

2  conservative estimate — as detailed above, the accountant's actual estimate was far above that

3  amount. The court credits the valuation.

4      The withdrawn objection alerted the court to two potential issues with the plaintiffs' best-case

5  damages estimate of $45.8 million. (Although the plaintiffs point out that "[b]ecause the variables

6  in a wage-and-hour damage analysis cause the numbers to vary so widely, . . . it is often difficult

7  to pinpoint a realistic 'potential recovery' in a . . . case such as this one. "[82]) For one, in

8  declarations submitted with the prior final-approval motion, Class Counsel "aggressively"

9  estimated minimum-wage damages of $75.8 million.[83] By contrast, their current declarations

10  estimate per-dancer minimum-wage damages that, when multiplied by the 8,402 class members,

11  amount to only about $323,000.[84] This difference is unexplained in the current settlement's

12  briefing. But even if $75 million should be added to the best-case damages estimate, such that the

13  proper figure is $120 million, the Settlement Consideration of $6.5 million is a 5.4% recovery,

14  which is within the range courts approve (as shown by the chart above).

15      Also, the settling objectors claimed that "the [current] damages analysis . . . fails to account for

16  what is likely the strongest claim in the case — the claim to recover house fees and stage fees."[85]

17  The defendants responded that the Clubs have not charged house or stage fees ("which are

18  amounts the dancers paid out-of-pocket to work a shift at the clubs") since 2000 (before the Class

19  Periods) and that since then, dancers have simply been paid a "contractually agreed upon

20  percentage" of the mandatory service charges paid by customers.[86] The objectors, however,

21  pointed to a declaration by the plaintiff in *Hughes* stating that she was "required to pay back" to

22

23

24  [81] Cahill Decl. in Supp. of Defs.' Reply to Obj., *id.* – ECF No. 249-1 at 2 (¶ 3); Shindel Decl. & Exs., Ex. B to Cahill Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 14–148.

25  [82] Mot. – ECF No. 269 at 15.

26  [83] Tidrick Decl., *id.* – ECF No. 163-1 at 3 (¶ 8).

27  [84] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 9 (¶ 30).

    [85] Obj., *id.* – ECF No. 244 at 7 n.3.

28  [86] Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 12–13.

the Clubs a house fee of "between $40–$150" each time she worked a shift.[87] Moreover, the complaints in both the San Francisco and San Diego cases allege damages resulting from house or stage fees.[88] But even if house fees should be added to the best-case damages scenario, such that the proper figure is higher than $120 million, the settlement can still be adequate. As shown by the chart above, courts have approved settlements in the one to two percent range (and the house-fee damages would have to be $205 million for the Settlement Consideration to be a two-percent recovery, which is implausible). And again, the $6.5 million Settlement Consideration is a conservative estimate.

That the changed business practices were first implemented in 2018 does not negate their value for purposes of analyzing the settlement. They are a product of the parties' settlement negotiations — they were put in place only after the defendants were sued and entered into the prior settlement in the San Diego Action.[89]

Furthermore, the recovery needs to be seen in context. The defendants' computer data shows that most Settlement Class Members worked very few overtime hours — "the average hours performed was 5.3 hours per day."[90] It also shows that Settlement Class Members, on average, were paid $34.89 per hour by the Clubs.[91] That amount consisted of mandatory service charges, not tips.[92] Thus, as the defendants assert, the claims for overtime and minimum wage damages would be minimal.[93] The settlement value is reasonable, given the amount of work performed and wages received by Settlement Class Members.

---

[87] Hughes Decl., *Hughes*, No. 16-cv-03371-LB – ECF No. 31-1 at 4 (¶ 13).

[88] Second Am. Compl. (San Francisco Action), Ex. B to Settlement Agreement – ECF No. 239-1 at 177–78 (¶ 92); Second Am. Compl. (San Diego Action), Ex. C to Settlement Agreement – ECF No. 239-1 at 229–30 (¶ 116).

[89] Defs.' Reply in re Mot. for Prelim. Approval, San Francisco Action – ECF No. 249 at 16–17.

[90] *Id.* at 9, 31; Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 9 (¶ 28); Shindel Mem., Ex. 4 to Shindel. Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 144.

[91] Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 9, 12; Shindel Mem., Ex. 4 to Shindel. Decl. in re Mot. for Prelim. Approval, *id.* – ECF No. 243 at 138, 144.

[92] Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 10–11 & n.6.

[93] *Id.* at 8–12.

United States District Court
Northern District of California

1       There are also litigation and recovery risks that are relevant to the fairness analysis.

2       The recovery risk is the effect of the COVID-19 pandemic on the Clubs. For example, "the

3   San Francisco Nightclubs were required to close . . . and generated no operating revenues for over

4   a year." Moreover, they were excepted from relief under the CARES Act.[94] One defendant recently

5   declared bankruptcy, and five of the Clubs have closed permanently.[95] Class Counsel also

6   reviewed "summary financial information showing the dire economic circumstances" of the

7   Clubs.[96] Objector counsel did too.[97] This financial hardship is relevant to the settlement-fairness

8   analysis, especially because the defendants' ability to absorb a large judgment is questionable.

9   *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("Here[,] one factor

10  predominates to make clear that the district court acted within its discretion [in approving the

11  settlement]. That factor is [the defendant's] financial condition."); *Sandoval Ortega v. Aho Enters.,*

12  *Inc.*, No. 19-cv-00404-DMR, 2021 WL 5584761, at *7–8 (N.D. Cal. Nov. 30, 2021) (taking the

13  defendants' "financial condition" into account in evaluating the settlement amount and noting their

14  "financial constraint and hardship" as a result of the pandemic); *In re Toys R Us*, 295 F.R.D. at 452

15  (damages could be "catastrophic" for the defendant, which "weigh[ed] in favor of [settlement]

16  approval").

17      There are other litigation risks.[98] One is that the plaintiffs would be unable to certify a class,

18  "due to, among other reasons, the arbitration agreements with comprehensive class and collective

19  action waivers."[99] *Cf. Zackaria v. Wal-Mart Stores, Inc.*, No. ED CV 12–1520, 2015 WL

20

21  _____

22  [94] Marlin Decl. in re Mot. for Prelim. Approval, Ex. C to Cahill Decl. in re Mot. for Prelim. Approval,
    *id.* – ECF No. 243 at 151–52 (¶ 5); Carlson Decl. in re Mot. for Prelim. Approval, Ex. D to *id.* – ECF
23  No. 243 at 154–58; *Deja Vu-San Francisco LLC v. U.S. Small Bus. Admin.*, No. 20-cv-03982-LB,
    2020 WL 6260010, at *7 (N.D. Cal. Sept. 11, 2020).

24  [95] Bankruptcy Notice, San Diego Action – ECF No. 108; Thompson Decl. in Supp. of Mot. for Prelim.
    Approval, San Francisco Action – ECF No. 239-1 at 31 (¶ 111).

25  [96] Mot. for Prelim. Approval, San Francisco Action – ECF No. 239 at 38; Thompson Decl. in Supp. of
    Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 31 (¶ 111).

26  [97] Liss-Riordan Decl., *id.* – ECF No. 266 at 3 (¶ 6).

27  [98] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 33–38; Thompson Decl. in Supp. of Mot. for
    Prelim. Approval, *id.* – ECF No. 239-1 at 10–14 (¶¶ 34–37); Mot. – ECF No. 269 at 16–18.

28  [99] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 34.

2412103, at *16 (C.D. Cal. May 18, 2015) (denying class certification as to claims that asset protection coordinators were misclassified as exempt because analyzing how employees spent their time is an individual question). The plaintiffs identify similar misclassification cases in which class certification was denied.[100] It would also be difficult, in a case like this, to prove both liability and damages on a classwide basis — for example, overtime claims would be difficult to establish (as discussed above).[101] That is especially true because the defendants have grounds to argue that the plaintiffs' alleged minimum wage damages should be offset by the prior compensation they received from the Clubs, which was in excess of the minimum wage. Some courts have accepted that argument, including the Eastern District of Michigan in a case before the Michigan action.[102]

It is also possible that the court would reject the plaintiffs' core argument that they were misclassified as independent contractors. For example, the "ABC" test, favorable to the plaintiffs' misclassification argument and adopted by the California Supreme Court in *Dynamex*, applies only to their Industrial Welfare Commission Wage Order-based claims. As to their Labor Code claims — to which the less-favorable *Borello* test applies — "[t]here are courts that have found that dancers are independent contractors under similar legal standards [and] similar facts."[103] In one case involving one of the same defendants as here, the California Court of Appeal affirmed a jury verdict finding that the dancer-plaintiff was properly classified as an independent contractor. *Buel v. Chowder House, Inc.*, No. A108951, 2006 WL 1545860, at *1 (Cal. Ct. App. June 7, 2006). The parties collected similar cases.[104]

---

[100] Mot. – ECF No. 269 at 16–17.

[101] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 33 (¶¶ 117–18).

[102] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 35; Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 8–12 (collecting cases).

[103] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 34; Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 32–33 (¶ 116).

[104] Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 24 n.10; Mot. for Prelim. Approval, *id.* – ECF No. 239 at 34; Mot. – ECF No. 269 at 17–18.

1    Also, as to the Wage Order claims, the defendants were likely to argue that dancers "fall

2 within the statutory exemptions for professionals and are not subject to overtime and other

3 provision of the Wage Orders."[105] In any case, *Dynamex* did not guarantee a favorable

4 misclassification finding for the plaintiffs. The defendants were going to argue that applying

5 *Dynamex* retroactively would violate federal due process (and no federal court has yet decided that

6 issue), because (1) "*Dynamex* establishes a fundamental change in California law," (2) several of

7 the defendants in these cases prevailed on worker misclassification claims under the previously

8 applicable standard, and (3) "in light of the breadth of . . . *Dynamex*, the California legislature was

9 quick to adopt a myriad of statutory *exceptions* in order to rein [its] application."[106]

10    "It is also worth noting that many, if not all, of the Class Members elected to Perform as

11 independent contractors, and not as employees, when given the option." Such election raises

12 "potential issues of estoppel, *in pari delicto*, and other equitable considerations . . . which could

13 negate or substantially reduce any recovery."[107] *Cf. Chowder House*, 2006 WL 1545860, at *9–10

14 (where a plaintiff voluntarily chooses to work as an independent contractor, she is more likely to

15 be properly classified as such).

16    The defendants raised further defenses in the parties' negotiations: (1) the compensation paid

17 to dancers came from mandatory service charges, not tips, so the defendants did not engage in

18 unlawful tip sharing; (2) many dancers lack standing to pursue their wage claims "and/or may

19 have difficulty in proving their damages because they never filed tax returns and therefore neither

20 reported their tip income nor paid taxes"; (3) the plaintiffs "cannot prove their joint employer

21 allegations"; (4) "the text of the PAGA statute is unclear as to whether PAGA penalties may be

22 'stacked'" and in any case, "recovery of the full 'stacked' amount . . . is highly unlikely because of

23 the facts of the case and . . . the trial court's discretion to reduce PAGA penalties"; (5) the

24 plaintiffs' meal- and rest-break claims have negligible value because (a) the defendants' "evidence

25

26

27

28

[105] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 32–33 (¶ 116).

[106] Defs.' Reply in re Mot. for Prelim. Approval, *id.* – ECF No. 249 at 13–15.

[107] Mot. for Prelim. Approval, *id.* – ECF No. 239 at 35–36.

shows that aggrieved employees exercised complete autonomy over when or whether to take a meal [or] rest break, and (b) "neither meal nor rest breaks were legally required in most of the circumstances here," given the dancers' average shift length; (6) the defendants did not act willfully, so no penalties are available under Cal. Lab. Code §§ 201–03; (7) penalties under Cal. Lab. Code § 226 could be reduced because of the defendants' good-faith belief regarding the plaintiffs' proper classification; (8) under § 226, penalties could be limited to $25,000 total because the defendants did not engage in a "pattern or practice" of willful misclassification; and (9) PAGA claims are subject to individual arbitration, which is particularly significant in light of the Supreme Court's grant of certiorari in *Viking River Cruises, Inc. v. Moriana* "to answer the question of whether the Federal Arbitration Act preempts a California Supreme Court ruling that arbitration agreements waiving the right to bring representative actions under PAGA [are] unenforceable."[108]

In light of the relevant context and litigation and recovery risks, the settlement value is fair, reasonable, and adequate.

Second, a settlement now results in money paid now, while litigation results in delay and expense. In cases with such an extensive history, this is a substantial concern. Moreover, "[t]his concern is particularly acute in a case such as this where the Class Members, by general nature, are more transient and difficult to find to secure testimony and evidence, and to deliver benefits to, as time goes by."[109] The settlement allows both parties to avoid contested litigation that would be costly and protracted.

Third, a class action allows Settlement Class Members — who otherwise would not pursue their claims individually because costs would exceed recoveries — to obtain relief. And here, there are additional reasons Class members would not pursue individual claims: they may be

---

[108] *Id.* at 36–37.

[109] *Id.* at 39.

1    reluctant "given the nature of the work," and "over three years has lapsed since the end of the

2    Class Period[s]."[110]

3         Fourth, the settlement is the product of serious, non-collusive, arm's-length negotiations. It

4    was reached after multiple mediations and extensive settlement negotiations over the course of

5    years, as detailed above.

6         Fifth, the PAGA allocation is within the range of reasonable settlements. *See, e.g.*, *Viceral*,

7    2016 WL 5907869, at *8–9.

8         Sixth, the settlement addresses concerns identified by the Ninth Circuit. It is non-reversionary,

9    contains no agreement about the fee request beyond an upper cap, and reduced the enhancement

10   payments consistent with the court's general approach (discussed below). *Roes 1–2*, 944 F.3d at

11   1048–60. The Dance Fee Pool is fully non-reversionary and therefore its value is easily

12   ascertainable.[111] Making its value even more easily ascertainable is the fact that, regardless of

13   whether a Settlement Class Member chooses a Cash Payment or a Dance Fee Payment, the

14   payment amount will apparently be the same: the member's share of Form 1099 Payments

15   multiplied "by the combined sum of the Net Cash Fund and the Dance Fee Pool."[112]

16        Finally, with only one objection and twenty exclusions, the reaction of the class is favorable. A

17   court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when

18   few class members object to it." *Ching v. Siemens Indus.*, No. 11-cv-04838-MEJ, 2014 WL

19   2926210, at *6 (N.D. Cal. June 27, 2014) (cleaned up); *cf. Staton*, 327 F.3d at 959 (the court

20   should consider "reaction of the class members to the proposed settlement").In sum, the court

21   finds that viewed as a whole, the proposed settlement is sufficiently fair, adequate, and reasonable.

22   Fed. R. Civ. P. 23(e)(2). The court approves the settlement.

23        For the same reasons, the court approves the settlement of the FLSA collective action.

24

25

26   [110] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 33 (¶ 119).

27   [111] Pls.' Reply in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 247 at 6.

28   [112] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF
     No. 239-1 at 85 (¶ 6.3.1).

United States District Court
Northern District of California

1    Aside from the objections of the settling objectors, Lapasia Colbert and Mackenzie Banks

2    objected that the bankrupt defendant, Bijou Century, LLC, should not be a party to the settlement

3    when the action is stayed as to Bijou.[113] 11 U.S.C. § 362(a)(1) (a party's bankruptcy "operates as a

4    stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial,

5    administrative, or other action or proceeding against the debtor that was or could have been

6    commenced before the commencement of" the bankruptcy). The defendants countered that

7    because the non-bankrupt defendants will fully fund the settlement, "Bijou's inclusion in the

8    release . . . will [not] alter the settlement in any way vis-à-vis any class member," and "all the

9    activity in the Roes Actions since Bijou filed for bankruptcy . . . would have occurred regardless

10   of Bijou's bankruptcy filing."[114]

11       The objection was likely procedurally defective and may not have presented a real issue for the

12   settlement. But out of an abundance of caution, at the fairness hearing the court asked the parties

13   to seek relief for cause from the bankruptcy court under Bankruptcy Code § 362(d)(1). The parties

14   did so, and on November 23, 2022, the bankruptcy court lifted the stay "so as to permit the entry

15   of a Judgment . . . pursuant to the [c]ourt's final approval of the proposed class-action

16   settlement."[115]

17

18   **4.  Approval of Objector Settlement**

19       The court approves $50,000 in attorney's fees for the settling objectors' counsel but reduces

20   the total enhancement payments for the settling objectors from $53,000 to $43,000.

21       Any "payment or other consideration . . . provided in connection with . . . withdrawing an

22   objection" to a class-action settlement must be approved by the court. Fed. R. Civ. P.

23   23(e)(5)(B)(i). The standard for approval varies depending on whether the consideration is

24   provided to objectors or their counsel.

25

26   _____

27   [113] Obj. – ECF No. 273.

     [114] Defs.' Resp. to Obj. – ECF No. 277.

28   [115] Pls.' Notice – ECF No. 283 at 1–2; Bankr. Ct. Order – ECF No. 283 at 3–5.

1    First, consideration provided to objector counsel can be approved only if the objector

2   "substantially enhanced the benefits to the class under the settlement." *Vizcaino v. Microsoft*

3   *Corp.*, 290 F.3d 1043, 1051–52 (9th Cir. 2002); *W. Publ'g Corp.*, 563 F.3d at 963 ($325,000

4   increase to the settlement fund was a substantial enhancement). The benefit must also be "worth

5   more than the fee [the objectors] are seeking." *Fraley v. Facebook, Inc.*, No. C 11-1726 RS, 2014

6   WL 806072, at *2 (N.D. Cal. Feb. 27, 2014), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594

7   (9th Cir. 2016).

8    "The 'substantial benefit' need not be financial," but if it is not, "the court must carefully

9   scrutinize the benefits conferred" to determine whether they are more than "technical or

10  coincidental." *In re HP Inkjet Printer Litig.*, No. 5:05-CV-3580 JF, 2011 WL 2462475, at *1

11  (N.D. Cal. June 20, 2011); *see also Kurihara v. Best Buy Co.*, No. C-06-1884 MHP (EMC), 2010

12  WL 11575583, at *3 (N.D. Cal. June 7, 2010) (substantial benefit where an objector achieved

13  clarification of the scope of the settlement's releases), *R. & R. adopted*, No. C-06-1884

14  MHP(EMC), 2010 WL 11575584 (N.D. Cal. July 6, 2010).

15   Fees for objector counsel should be evaluated "on the same equitable principles as [fees for]

16  class counsel." *Rodriguez v. Disner*, 688 F.3d 645, 658 (9th Cir. 2012). Thus, "where objectors do

17  not add any new legal argument or expertise," or "do not participate constructively in the

18  litigation," no fees should be awarded. *Id.* at 659.

19   The amount of any fee award is a matter for the court's discretion. *Id.* at 653. Ordinarily, the

20  award should be based on a percentage of the benefits the objector conferred on the class, and

21  courts in this district have awarded varying percentages depending on the value of the benefits

22  conferred. *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB,

23  2015 WL 4776946, at *2 (N.D. Cal. Aug. 13, 2015) (awarding 8.8% where the benefit conferred

24  was over $1 million); *Kurihara*, 2010 WL 11575583, at *3 (awarding 29.9% where the benefit

25  conferred was $52,335). Alternatively, as with class counsel fees, "when special circumstances

26  indicate that the percentage recovery would be either too small or too large in light of the hours

27  devoted to the case or other relevant factors," the percentage calculation can be "replaced by a

28  lodestar calculation." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1127 (9th Cir. 2002) (cleaned up).

1        "[T]he proper procedure" for approval of a payment to objector counsel "is by motion under

2    Rule 23(h) for an award of fees." Fed. R. Civ. P. 23 advisory committee's notes 2018

3    amendments. Objector counsel "bears the burden of submitting detailed time records justifying the

4    hours claimed to have been expended." *Wininger*, 301 F.3d at 1126.

5        Second, payments to objectors themselves in connection with withdrawing an objection are

6    evaluated in the same way as incentive awards for named plaintiffs. *Cf. In re Transpacific*, 2015

7    WL 4776946, at *2. But as with payments to objector counsel, the objector must have

8    "substantially enhanced the benefits to the class under the settlement." *See Fraley*, 2014 WL

9    806072, at *1–2 (cleaned up).

10       Here, the objectors withdrew their objections and asked for (1) enhancement payments totaling

11   $53,000 (with individual payments ranging from $3,500 to $10,000), and (2) $50,000 in attorney's

12   fees for their counsel.[116] The objectors achieved an additional reminder notice to the class and,

13   because the Enhanced Terms of Employment were extended by one year, an additional $1,000,000

14   in Settlement Consideration.[117] This is a substantial enhancement of the settlement. *W. Publ'g*

15   *Corp.*, 563 F.3d at 963.

16       The court approves $50,000 in objector attorney's fees, which is five percent of the value of

17   the benefits conferred by the objectors. *In re Transpacific Passenger Air Transp. Antitrust Litig.*,

18   2015 WL 4776946, at *2.

19       The court also approves enhancement payments for the settling objectors, but for the three

20   objectors who requested more than $5,000, the court reduces their payments to $5,000. In this

21   district, a $5,000 incentive award is presumptively reasonable. *Bellinghausen v. Tractor Supply*

22   *Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (collecting cases). The justification for the three

23   requests of more than $5,000 is that those objectors had not "already executed a release with [the]

24   [d]efendants as part of a prior individual settlement in arbitration, [and] had more substantial 'live'

25

26   [116] Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263 at 3–4; Amendment to Settlement Agreement, Ex. 1 to Young Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No.

27   263-1 at 6–7; Withdrawal of Objs., *id.* – ECF No. 265; Liss-Riordan Decl., *id.* – ECF No. 266; Defs.' & Objectors' Update – ECF No. 278 at 4 (setting forth the individual payment amounts).

28   [117] Pls.' Suppl. Br. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 263 at 4–5.

*United States District Court*
*Northern District of California*

1   claims that they intended to pursue in a future case upon opting out of the Roes Actions."[118] But

2   the factors used to evaluate incentive awards are about the class members' contribution to the

3   present case, not their future plans to sue after opting out. *Staton*, 327 F.3d at 977 (district courts

4   must evaluate proposed awards individually, using relevant factors that include "the actions the

5   [class member] has taken to protect the interests of the class, the degree to which the class has

6   benefitted from those actions, . . . [and] the amount of time and effort the [class member]

7   expended in pursuing the litigation") (cleaned up). Thus, Rashele Hamren, Devon Locke, and

8   Diana Tejada are entitled only to $5,000 each, such that the total in enhancement payments to the

9   settling objectors is $43,000 rather than $53,000.

### 5.  Attorney's Fees and Costs

Class Counsel moved for a total of $2,166,666.71 in attorney's fees (thirty-three percent of the

Settlement Consideration) and $55,423.07 in costs.[119] The court awards both amounts.

"In a certified class action, the court may award reasonable attorney's fees and nontaxable

costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

The court must ensure that the award is reasonable. *In re Bluetooth Headset Prods. Liab. Litig.*,

654 F.3d 935, 941 (9th Cir. 2011). The court is not bound by the parties' settlement agreement as to

the amount of fees. *Id.* at 941–43. The court must review fee awards with special rigor:

> Because in common fund cases the relationship between plaintiffs and their attorneys
> turns adversarial at the fee-setting stage, courts have stressed that when awarding
> attorneys' fees from a common fund, the district court must assume the role of
> fiduciary for the class plaintiffs. Accordingly, fee applications must be closely
> scrutinized. Rubber-stamp approval, even in the absence of objections, is improper.

*Vizcaino*, 290 F.3d at 1052 (cleaned up).

When counsel recovers a common fund that confers a "substantial benefit" on a class of

beneficiaries, counsel is "entitled to recover their attorney's fees from the fund." *Fischel v.*

---

[118] Defs.' & Objectors' Update – ECF No. 278 at 4.

[119] Mots. for Attorney's Fees, *id.* – ECF Nos. 270, 274.

United States District Court
Northern District of California

1   *Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002). In common-fund

2   cases, courts may calculate a fee award under either the "lodestar" or "percentage of the fund"

3   method. *Id.*; *Hanlon*, 150 F.3d at 1029.

4        The "percentage of the fund" method is typically used. The Ninth Circuit has established a

5   "benchmark" that fees should equal twenty-five percent of the settlement, although courts diverge

6   from the benchmark based on factors that include "the results obtained, risk undertaken by

7   counsel, complexity of the issues, length of the professional relationship, the market rate, and

8   awards in similar cases." *Morales v. Stevco, Inc.*, No. CIV-F-09-0704-AWI-JLT, 2013 WL

9   1222058, at *2 (E.D. Cal. Mar. 25, 2013); *Morris v. Lifescan, Inc.*, 54 F. App'x 663, 664 (9th Cir.

10   2003) (affirming thirty-three-percent fee award); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379

11   (9th Cir. 1995) (same).

12        Ninth Circuit precedent also requires courts to award class counsel fees based on the total

13   benefits made available to class members rather than the actual amount ultimately claimed. *Young*

14   *v. Polo Retail, LLC*, No. C-02-4546-VRW, 2007 WL 951821, at *8 (N.D. Cal. Mar. 28, 2007)

15   ("district court abused its discretion in basing attorney fee award on actual distribution to class"

16   instead of amount made available) (citing *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026,

17   1027 (9th Cir. 1997)).

18        If the court applies the percentage method, it then typically calculates the lodestar as a "cross-

19   check to assess the reasonableness of the percentage award." *See, e.g.*, *Weeks v. Kellogg Co.*, No.

20   CV-09-8102-MMM-RZx, 2013 WL 6531177, at *25 (C.D. Cal. Nov. 23, 2013); *see also Serrano*

21   *v. Priest*, 20 Cal. 3d 25, 48–49 (1977); *Fed-Mart Corp. v. Pell Enters.*, 111 Cal. App. 3d 215, 226–

22   27 (1980). "The lodestar . . . is produced by multiplying the number of hours reasonably expended

23   by counsel by a reasonable hourly rate." *Lealao v. Beneficial Cal., Inc.*, 82 Cal. App. 4th 19, 26

24   (2000). "Once the court has fixed the lodestar, it may increase or decrease that amount by applying

25   a positive or negative 'multiplier' to take into account a variety of other factors, including the

26   quality of the representation, the novelty and complexity of the issues, the results obtained, and the

27   contingent risk presented." *Id.*; *accord Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503–06

28   (2016) (holding, under California law, that "the percentage method to calculate [attorney's] fee[s]

United States District Court
Northern District of California

in a common fund case" is appropriate and the trial court has "discretion to conduct a lodestar cross-check on a percentage fee").

Based on counsel's declarations and the results they achieved in this litigation, the requested fees are reasonable and appropriate as a percentage of the common fund, supported by a lodestar cross-check (with the plaintiffs' suggested multiplier). There are ample reasons to award thirty-three percent in attorney's fees in this case.

First, Class Counsel obtained substantial benefits for the class. The estimated average recovery, even when measured by the net settlement amount, is $274.35 (five percent of the average individual damages). Counsel also achieved conversion of the class from independent contractors to employees, which "constitutes what can be described as the proverbial 'full victory' for a dancer plaintiff."[120] This was achieved even though "the burdens [on the defendants] of classifying dancers as employees . . . are tremendous."[121] Second, Class Counsel litigated the case exceptionally well for many years — more than eight in the case of the San Francisco Action. For example, counsel achieved an appellate victory affirming the court's denial of the defendants' motion to compel arbitration. Third, there were significant risks involved with the litigation, as detailed above. Fourth, the lodestar cross-check for the attorney's fees request by Class Counsel in the San Francisco Action shows a negative multiplier.[122]

As for the lodestar cross-check, the billing rates are normal and customary for timekeepers with similar qualifications and experience in the relevant market. *Cuviello v. Feld Ent., Inc.*, No. 13-cv-04951-BLF, 2015 WL 154197, at *2 (N.D. Cal. Jan. 12, 2015) ("The Court has broad discretion in setting the reasonable hourly rates used in the lodestar calculation."); *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001) (court can rely on its own experience); *accord Open Source Sec. v. Perens*, 803 F. App'x 73, 77 (9th Cir. 2020). Class Counsel also submitted a sufficient breakdown of their hours and the billing rates in the relevant market to reach a conclusion about

---

[120] Mot. for Attorney's Fees, *id.* – ECF No. 274 at 9–10.

[121] *Id.* at 13.

[122] Tidrick Decl., *id.* – ECF No. 270-1 at 6 (¶¶ 15–16).

1    the lodestar and the suggested multiplier.[123] The modest multipliers fall within the range of

2    multipliers that courts approve. *Vizcaino*, 290 F.3d at 1051 n.6 ("Multiples ranging from one to

3    four are frequently awarded in common fund cases when the lodestar method is applied.")

4    (cleaned up).

5        The court thus grants Class Counsel's request for fees of thirty-three percent of the Settlement

6    Fund, in line with comparable cases.[124]

7        Class Counsel also are entitled to reimbursement of reasonable out-of-pocket costs. Fed. R.

8    Civ. P. 23(h); *see Harris v. Marhoefer*, 24 F.3d 16, 20 (9th Cir. 1994) (attorneys may recover

9    reasonable expenses that would typically be billed to paying clients in non-contingency matters);

10   *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (approving reasonable

11   expenses in class action settlement). Compensable expenses include "nontaxable costs that are

12   authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

13       The record establishes sufficiently the reasonableness of the requested expenses.[125] The court

14   approves the requested amounts of $8,164.32 (San Francisco Action) and $47,258.75 (San Diego

15   Action), totaling $55,423.07.

16

17   **6.  Enhancement Payments**

18       The plaintiffs moved for Enhancement Payments totaling $35,000: $3,500 each for Jane Roes 1

19   and 2 in the San Diego Action, $5,000 each for Jane Roes 1 and 3 in the San Francisco Action, and

20   $3,000 each for Jane Roes 2, 10, 11, 12, 13, and 22 in the San Francisco Action.[126] The court grants

21   the motion as to the four Class Representatives only.

22

23   ----

[123] Tidrick Decl., *id.* – ECF No. 270-1; Pearl Decl. & Exs., *id.* – ECF No. 270-1; Thompson Decl., *id.*
24   – ECF No. 274-1 at 1–9; Bonanni Decl., *id.* – ECF No. 274-2.

[124] Mot. for Attorney's Fees, *id.* – ECF No. 270 at 15 (collecting cases); Mot. for Attorney's Fees, *id.* –
25   ECF No. 274 at 11–12 & n.13 (same).

[125] The Tidrick Law Firm LLP Costs, Ex. 3 to Tidrick Decl., *id.* – ECF No. 270-1 at 38–39; Sommers
26   Schwartz, P.C. Costs, Ex. A to Thompson Decl., *id.* – ECF No. 274-1 at 11–15; Pitt McGehee Costs,
     Ex. 1 to Bonanni Decl., *id.* – ECF No. 274-2 at 8.
27
[126] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF
28   No. 239-1 at 80 (¶ 5.2(a)(i)); Mots. for Attorney's Fees – ECF Nos. 270, 274.

United States District Court
Northern District of California

1    District courts must evaluate proposed awards individually, using relevant factors that include

2  "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class

3  has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in

4  pursuing the litigation." *Staton*, 327 F.3d at 977 (cleaned up). "Such awards are discretionary . . .

5  and are intended to compensate class representatives for work done on behalf of the class, to make

6  up for financial or reputational risk undertaken in bringing the action, and, sometimes, to

7  recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563

8  F.3d 948, 958–59 (9th Cir. 2009) (cleaned up). The Ninth Circuit has "noted that in some cases

9  incentive awards may be proper but [has] cautioned that awarding them should not become routine

10  practice." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (discussing

11  *Staton*, 327 F.3d at 975–78). District courts "must be vigilant in scrutinizing all incentive awards

12  to determine whether they destroy the adequacy of the class representatives." *Id.* at 1164. In this

13  district, a $5,000 incentive award is presumptively reasonable. *Bellinghausen*, 306 F.R.D. at 266

14  (collecting cases).

15    The record establishes sufficiently the efforts of the Class Representatives.[127] The court thus

16  approves Enhancement Payments totaling $17,000: $3,500 each for Jane Roes 1 and 2 in the San

17  Diego Action, and $5,000 each for Jane Roes 1 and 3 in the San Francisco Action. The court

18  denies the requested $3,000 payments for Jane Roes 2, 10, 11, 12, 13, and 22 in the San Francisco

19  Action, because they are not Class Representatives. *Staton*, 327 F.3d at 977 ("[N]amed plaintiffs,

20  as opposed to designated class members who are not named plaintiffs, are eligible for reasonable

21  incentive payments.").

22

23  **7. Appointment of Class Representatives, Class Counsel, and Settlement Administrator**

24    The court confirms its appointment of Jane Roes 1 and 2 from the San Diego Action and Jane

25  Roes 1 and 3 from the San Francisco Action as the Class Representatives. They are adequate

26

27

28  ───────────────
[127] Class Representative Decls., *id.* – ECF Nos. 159-2, 159-4, 239-3 to -6.

representatives of the other members of the Class and have claims that are typical of the other members' claims.[128]

The court confirms its appointment of attorneys from three law firms as Class Counsel for settlement purposes only: Joel Young and Steven Tidrick of The Tidrick Law Firm, LLP; Jason Thompson of Sommers Schwartz, P.C.; and Megan Bonanni of Pitt McGehee Palmer & Rivers, P.C. Fed. R. Civ. P. 23(a) & (g)(1). They have sufficient qualifications, experience, and expertise in prosecuting class actions.[129]

The court also confirms its appointment of Simpluris, Inc. as the Settlement Administrator, and approves payment of Administrative Costs of up to $150,000.

## 8. Class Notice

As described above, the Settlement Administrator provided notice to the class in the form the court approved previously. The notice met all legal prerequisites: it was the best notice practicable, satisfied the requirements of Rule 23(c)(2), adequately advised class members of their rights under the settlement agreement, met the requirements of due process, and complied with the court's order regarding court notice. The forms of notice fairly, plainly, accurately, and reasonably provided class members with all required information, including (among other things): (1) a summary of the lawsuit and claims asserted; (2) a clear definition of the class; (3) a description of the material terms of the settlement, including the estimated payment; (4) a disclosure of the release of the claims; (5) the date, time, and location of the final fairness hearing; and (6) the identity of class counsel and the provisions for attorney's fees, costs, and class-representative service awards.[130]

---

[128] Class Representative Decls., *id.* – ECF Nos. 239-3 to -6.

[129] Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 2 (¶¶ 1–4); Sommers Schwartz Firm Resume, Ex. A to *id.* – ECF No. 239-1 at 36–45; Tidrick Decl. – ECF No. 270-1 at 2–4 (¶¶ 1–7).

[130] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 74–79 (¶¶ 4.1–4.10); Notices, Exs. D, G & H to Thompson Decl. in Supp. of Mot. for Prelim. Approval – ECF No. 239-1 at 244–53, 262, 264; Notices, Exs. A–F to Butler Decl. – ECF No. 269-1 at 7–28.

1    Moreover, the forms of notice eliminated the concerns the Ninth Circuit had with the notice

2    plan in the prior San Francisco Action settlement. *Roes 1–2*, 944 F.3d at 1046–48. Specifically,

3    the notice plan went well beyond a single mailed notice plus a posting in the Clubs' dressing

4    room. It was robust because it provided for reminder notices and multiple forms of electronic

5    notice, including that specifically suggested by the Ninth Circuit. *Id.* at 1047 (suggesting a posting

6    on StripperWeb.com). Thus, the notice plan is approved.

7

8    **9. Compliance with CAFA**

9    The Settlement Agreement required the defendants to timely send the CAFA Notice to all

10   appropriate officials under CAFA, 20 U.S.C. § 1715(b).[131] Under that timeline, the court's final

11   approval hearing was more than ninety days after service, as required by CAFA.

12

13   **10. Ancillary Items**

14   The court confirms its consolidation of the San Francisco and San Diego Actions for

15   settlement purposes only. Consolidation is appropriate because the cases involve common issues

16   of law and fact, including the same club brands and entertainers who are potential class members

17   in both lawsuits, and it otherwise expedites the settlement proceedings and eliminates unnecessary

18   repetition and confusion. Fed. R. Civ. P. 42(a); *see In re HP Inkjet Printer Litig.*, No. C05-3580

19   JF, 2010 WL 11488941, at *1 (N.D. Cal. Oct. 1, 2010) (consolidating cases for settlement

20   purposes where the relief provided by the settlement is similar in each and it would be more

21   efficient to administer the settlement in one action).

22   The twenty Settlement Class Members who requested exclusion from the Settlement Class are

23   excluded from the settlement.[132]

24   The late-filed Dance Fee Election Form, which was postmarked October 20, 2022, is valid.[133]

25

26   [131] Settlement Agreement, Ex. B to Thompson Decl. in Supp. of Mot. for Prelim. Approval, *id.* – ECF No. 239-1 at 72 (¶ 3.4(b)).

27   [132] Proposed Order – ECF No. 280 at 5 (¶ 17).

28   [133] *Id.* (¶ 18).

United States District Court
Northern District of California

1   The Settlement Administrator must distribute the settlement funds as specified in the

2   Settlement Agreement.[134]

3   Except as otherwise provided by this order, the parties and objectors will bear their own costs

4   and attorneys' fees.[135]

5   The San Francisco and San Diego Actions are dismissed, and the claims are released as

6   provided in the Settlement Agreement. Without affecting the finality of this Final Approval Order,

7   the court retains jurisdiction over: (1) effectuating and implementing the Settlement Agreement

8   and its terms; (2) supervising all aspects of the administration of the Settlement Agreement; (3)

9   determining whether, in the event that an appeal is taken from any aspect of this Final Approval

10  Order, the appellant must post a bond or provide other security, and such other matters as the court

11  may order; (4) enforcing and administering the Settlement Agreement, including any releases

12  executed in connection therewith, and the provisions of this Final Approval Order; (5)

13  adjudicating any disputes that arise under the Settlement Agreement; and (6) any other matters

14  related or ancillary to the foregoing.[136]

## CONCLUSION

16  The court approves the class-action settlement, including the attorney's fees and costs,

17  administrative costs, and enhancement payments for the class representatives. The court denies

18  enhancement payments for Jane Roes 2, 10, 11, 12, 13, and 22 in the San Francisco Action.

19  This disposes of ECF Nos. 269, 270, and 274 in the San Francisco Action.

20  **IT IS SO ORDERED.**

21  Dated: November 29, 2022

23  LAUREL BEELER
    United States Magistrate Judge

_____

[134] *Id.* at 6 (¶ 20).

[135] *Id.* (¶ 22).

[136] *Id.* (¶ 23).

*(left margin, vertical text)* United States District Court / Northern District of California